# EXHIBIT 1

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

STEVE S. WEINSHEL, individually and on
behalf of all others similarly situated,

        Plaintiff,

        v.

OCWEN FINANCIAL CORPORATION, a
Georgia corporation, OCWEN LOAN
SERVICING, LLC, a Delaware limited
liability company, ALLY FINANCIAL INC.,
a Delaware corporation, and GMAC
MORTGAGE GROUP LLC, a Delaware
company,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:

Hon. Judge:

JURY TRIAL DEMANDED

CALENDAR/ROOM 02
TIME 00:00
Class Action

## CLASS ACTION COMPLAINT

NOW COMES Plaintiff, Steve S. Weinshel, by his attorneys, Edelson LLC, on behalf of himself and all others similarly situated and, complaining of defendants Ocwen Financial Corporation, Ocwen Loan Servicing, LLC, Ally Financial Inc., and GMAC Mortgage Group LLC, states:

## NATURE OF THE CASE

1.     Plaintiff and Class Members are mortgagees in the State of Illinois whom Defendants have charged ongoing property inspection fees for purported, "drive-by" property inspections. To the extent Defendant has even conducted inspections, it has done so without a reasonable basis, often month after month, offering no reasonable means to avoid its ongoing imposition of inspection fees.

2.     Defendants' intent and purpose is to derive ongoing financial benefit from the inspection fees Defendants imposed on Plaintiff and Class Members.

1

3.    As detailed below, Plaintiff alleges that Defendants' practices relating to its ongo-ing, purported inspections and imposition of fees give rise to the claims set forth in this com-plaint.

## PARTIES

4.    Plaintiff Steve S. Weinshel ("Plaintiff") resides in Cook County, Illinois.

5.    Defendant Ocwen Financial Corporation is a Florida corporation with principal offices at 2002 Summit Boulevard, 6th Floor, Atlanta, Georgia 30319. Ocwen Financial Corpo-ration has no registered agent in the State of Illinois.[1] Ocwen Financial Corporation is the parent company of Defendant Ocwen Loan Servicing, LLC.

---

[1] Ocwen Financial Corporation does business in the State of Illinois, maintaining a substantial and contin-uous commercial presence in Illinois, availing itself of the privilege of conducting activities in Illinois, and thereby invoking the benefits and protections of its laws.

(a) According to its most recent 10-K filing with the Securities and Exchange Commission:

> We earn fees for providing services to owners of mortgage loans . . . . The mortgaged proper-ties securing the loans that we service are geographically dispersed throughout all 50 states . . . . The five largest concentrations of properties are located in California, Florida, New York, Texas and Illinois which, taken together, comprise 42% of the loans serviced at December 31, 2012.

Ocwen Financial Corporation, Form 10-K at 10 (March 1, 2013). Ocwen Financial Corporation reported that, as of December 31, 2012, it serviced over 53,000 residential loans and foreclosed properties in Illi-nois. *Id.* at F-33. It exercises direct control over the business activities of its subsidiaries engaged in ser-vicing activities, including Ocwen Loan Servicing, LLC, inasmuch as it states in its 10-K that "we" earn fees for servicing loans for properties in Illinois, *see id.* at 10. Further, it states in its 10-K:

> Ocwen Financial Corporation is a financial services holding company which, *through its sub-sidiaries*, is engaged in the servicing and origination of mortgage loans. When we use the terms "Ocwen," "OCN," "we," "us" and "our," *we are referring to Ocwen Financial Corpo-ration and its consolidated subsidiaries.*

*Id.* at 3 (emphasis added).

(b) Further, on Ocwen Financial Corporation's website, it has posted a January 29, 2009 notice of a con-ference call to review operating results. The notice included this statement:

> Ocwen Financial Corporation is a leading business process outsourcing provider to the financial services industry, specializing in loan servicing, mortgage fulfillment and re-ceivables management services. Ocwen is headquartered in West Palm Beach, Florida with offices in Arizona, California, Florida, Georgia, Illinois and New York and global operations in Canada, Germany and India.

*(continued)*

2

6.    Defendant Ocwen Loan Servicing, LLC is a Delaware limited liability company with principal offices at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409 and a correspondence address identical to that of 3451 Hammond Avenue, P.O. Box 780, Waterloo, Iowa 50704—identical to the correspondence address for Defendant GMAC Mortgage, LLC. Ocwen Loan Servicing LLC's website lists its Illinois Residential Mortgage Licensee number as MB 6759457. Its agent for service of process is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

7.    Defendant Ally Financial Inc. ("AFI"), formerly known as GMAC Inc., is a Delaware corporation with principal offices at 200 Renaissance Center, Detroit, Michigan, 48265, and is the parent company of GMAC Mortgage, LLC. Ally Financial Inc.'s agent for service of process is C T Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604. Ally Financial Inc. exercises control and dominion over the defendants named below, which are its direct and indirect subsidiaries.[2]

---

http://shareholders.ocwen.com/releasedetail.cfm?ReleaseID=585595 (visited March 12, 2013). In addition, the Ocwen Financial Corporation website includes testimonials from Illinois residents, a copy of an Illinois government announcement of a Mortgage Relief Project

(c) Ocwen Financial Corporation has, as a plaintiff, availed itself of the court of the State of Illinois and the County of Cook.

[2] The dominion and control exercised by Ally Financial Inc. ("AFI") over its direct and indirect subsidiaries named herein is borne out by a number of factors:

(a) AFI wholly owns GMAC Mortgage Group LLC, which wholly owns Residential Capital, LLC (ResCap).

 (i) ResCap wholly owns GMAC Residential Holding Company, LLC, which wholly owns GMAC Mortgage, LLC, Plaintiff's previous servicer during the Class Period.

 (ii) ResCap wholly owns GMAC-RFC Holding Company, LLC, which wholly owns Residential Funding Company, LLC (f/k/a Residential Funding Corporation) which, according to the current servicer, is the holder of Plaintiff's note.

(b) AFI's dominion and control over its direct and indirect subsidiaries named herein is further borne out by the following: a chain of ownership extends from the subsidiary defendants ultimately to AFI; AFI's direct subsidiary, GMAC Mortgage Group LLC, has virtually no employees and has overlapping management with other AFI subsidiaries; from 2007 to 2009, AFI provided subsidiaries with $10 billion in capital contributions.

*(continued)*

8.    Defendant GMAC Mortgage Group LLC, is a Delaware company with principal offices at 200 Renaissance Center, Detroit, Michigan, 48265, and is the parent company of GMAC Mortgage, LLC. GMAC Mortgage Group LLC's agent for service of process is C T Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

9.    Further, the following parties are currently in Chapter 11 proceedings and are not named herein:

a.    Defendant Residential Capital, LLC ("ResCap") is a Delaware limited liability company with principal offices at One Meridian Crossings, Minneapolis, Minnesota 55423. Residential Capital, LLC has no registered agent in the State of Illinois.

---

(c) As to ResCap, in particular:
  (i) ResCap stated in a 2005 registration statement filed with the SEC:

> [AFI] indirectly owns all of our outstanding common stock and has the power to elect and remove all of our directors, including the two independent directors . . . . GMAC is also able to approve or reject any action requiring the approval of our stockholders, including the adoption of amendments to our certificate of incorporation and approvals of mergers or sales of all or substantially all of our assets. [AFI] is similarly controlled by GM.

Residential Capital Corp., Form S-4, Amendment No. 2, at 22-23 (Sept. 20, 2005). AFI has provided ResCap with funding as well as indemnification protection from liabilities related to AFI and other AFI subsidiaries.
  (ii) On ResCap's website at www.rescapholdings.com (visited March 12, 2013), clicking on the "Privacy and SSN Policies" link at the bottom of the home page results in being directed to AFI's Privacy page at www.ally.com/privacy.
(d) Further indicia of AFI's control of the subsidiaries named here includes:
  (i) Residential Funding Company, LLC, in recent court proceedings, has described its corporate ownership as follows: "Residential Funding Company, LLC ('GMAC') . . . is a wholly owned indirect subsidiary of Ally Financial Inc. f/k/a GMAC Inc." *Johnlewis v. U.S. Bank, et al.*, No. 4:12-cv-3360 (S.D. Tex. Nov. 14, 2012), Dkt. 4 at 1.
  (ii) On the website of GMAC Mortgage, LLC at www.gmacmortgage.com (visited March 12, 2013), clicking on the "privacy" link at the bottom of the home page results in being directed to www.gmacmortgage.com/privacy.html, on which the following statements appear:

GMAC Mortgage is an indirect, wholly owned subsidiary of Ally Financial Inc. (formerly known as GMAC Inc.).

Click here to view a PDF of GMAC Mortgage's Online Privacy Policy.

Clicking on the second statement causes the AFI privacy policy to be displayed.

b.   Defendant GMAC-RFC Holding Company, LLC (a/k/a GMAC-RFC Holding Corporation, a/k/a GMAC RF, Inc.) is a Delaware limited liability company with principal offices at 8400 Normandale Lake Blvd Suite 350, Minneapolis, Minnesota 55437. GMAC-RFC Holding Company, LLC has no registered agent in the State of Illinois.

c.   Defendant Residential Funding Company, LLC, formerly known as Residential Funding Corporation, is a Delaware limited liability company with principal offices at 8400 Normandale Lake Boulevard, Suite 350, Minneapolis Minnesota 55437. Residential Funding Company, LLC's agent for service of process is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

d.   Defendant GMAC Mortgage, LLC ("GMAC"), formerly known as GMAC Mortgage Corporation, is a Delaware limited liability company with principal offices at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034 and a correspondence address of 3451 Hammond Avenue, P.O. Box 780, Waterloo, Iowa 50704. GMAC Mortgage, LLC's agent for service of process is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

### JURISDICTION AND VENUE

10.   Plaintiff brings this action pursuant to 735 ILCS 5/2-801, *et seq.*

11.   Jurisdiction in this matter is conferred by 735 ILCS 5/2-209, in that, within the State of Illinois and the County of Cook, Defendants have transacted business and committed acts that directly relate to matters raised in this complaint, and Defendants have done so continuously throughout the Class Period in a manner sufficient to support personal jurisdiction.

12.   Venue is proper in Cook County, Illinois, because Plaintiff resides in that county and because the allegations in this complaint arise from conduct undertaken and having effect in this county.

## ALLEGATIONS

13.     On December 23, 2004, Plaintiff entered into a mortgage agreement with New Century Mortgage Corporation to refinance his primary dwelling (Plaintiff's "Residence"), a condominium unit with an undivided interest in common elements of the condominium project in which the unit is located.

14.     Plaintiff's mortgage agreement includes the following terms:

> Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

(*See* Mortgage Agreement, a true and accurate copy of which is attached as Exhibit A.)

15.     During the Class Period, Plaintiff's mortgage was serviced by Defendant GMAC Mortgage, LLC until mid-February 2013, when Plaintiff received a mailed notice from Ocwen Loan Servicing, LLC at the same correspondence address as GMAC Mortgage, LLC. The notice stated, "Ocwen Loan Servicing, LLC is servicing your account on behalf of Residential Funding Corp, which currently owns the interest in your account."

16.     Commencing on or about December 17, 2009 and continuing to the present, Defendants have charged Plaintiff monthly fees for purported inspections of the Residence.

17.     In January 2011, Plaintiff requested that GMAC remove the property inspection fees it had charged to his account; GMAC responded in writing later that month, refusing to do so.

18.     In GMAC's response to Plaintiff's request, GMAC provided records purporting to detail its inspection efforts. The records included a log sheet that included the name, "CoreLogic Field Services" of Dallas, Texas, and dated log entries, each of which included notations such as "Borrower interview" and "Occupant name unknown," and "Completed." The records sent by

GMAC also included a series of pages labeled "Inspection Invoice Details" and "Inspection Work Order Completion Form" that appeared to have been created by CoreLogic Field Services for a client named "GMAC Homecomings." These detail pages included Plaintiff's name and the notations such as "Borrower Interview," "Collection," and "Occupancy: No access" or "Occupation Determined By: Visual." The detail pages all included "Call Back Card" sections containing the text:

| | | |
|---|---|---|
| Name: STEVEN S WEINSHE... | Account: | Date: |
| Address: | | |
| Please Call: GMAC Mortgage, LLC | Contact:Loan Counselor | At: |

Note: Our Representative called on you today while you were out. There is an important matter we would like to discuss with you. This inspection is not in any way an attempt to collect a debt.

(Ellipses in original). In addition, the details pages included the notations such as "Property Condition: Good" or "Property Condition: Not Applicable." One of the detail pages included the comment, "ACCESS DENIED - SECURE BUILDING, ACCESS DENIED - KEYCODE REQUIRED."

19.     GMAC's January response also included photographs of the property exterior of the building containing the Residence and a photograph of the vestibule doorbell plate. The photographs bore dates of January 18, February 22, and April 23, 2011.

20.     A number of purported inspection dates noted in the pages of GMAC's January response correspond to days when Plaintiff was working from home at the Residence.

21.     On no occasion has any person purporting to be an inspector acting on behalf of any of Defendants contacted Plaintiff to conduct a borrower interview.

22.     On no occasion has any person purporting to be an inspector acting on behalf of any of Defendants contacted Plaintiff to request entry into the building containing the Residence or entry into the Residence.

7

23.     On no occasion has Plaintiff received any communication from any of Defendants setting forth any reason for any inspection or the continuing series of inspections or any means by which Plaintiff might avoid subsequent inspections and fees.

24.     Plaintiff's sole communication from a purported inspector acting on Defendants' behalf occurred on the evening of April 6, 2012, when Plaintiff found a folded piece of paper taped to the intercom panel in the vestibule of the Residence building; the following text was printed on the paper:

> Name: STEVEN S WEINSHEL     Account: ▓▓▓▓▓▓     Date:
> Address: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> Please Call: GMAC Mortgage, LLC     Contact:Loan Counselor     At:800-850-4622
> Note: Our Representative called on you today while you were out. There is an important matter we would like to discuss with you. This inspection is not in any way an attempt to collect a debt.

(Personal identifying information redacted). Plaintiff telephoned the number indicated on the paper, spoke to a GMAC representative, and responded to the representative's request that he confirm his contact information; the GMAC representative did not ask any questions or provide any information about any reason or need for inspection or results of inspections.

25.     On one other occasion, in the outside courtyard of the building in which the Residence is located, Plaintiff encountered an individual who represented himself as an inspector and who asked Plaintiff if he and his wife still occupied the Residence. Plaintiff replied, "Yes," and the individual left.

26.     Other than April 6, 2011 and the encounter in the courtyard, on no other occasion has Plaintiff found or received any communication purporting to be from an inspector acting on behalf of any of Defendants.

27.     The fees Defendants have charged Plaintiff have ranged from approximately $11.25 to approximately $28.75 per month.

28.    To the extent the inspection fees charged by Defendants have arisen from Defendants' continued, monthly inspections of the undivided, common elements of the condominium project in which the Residence is location, such continuing, monthly inspections have no reasonable purpose and any related fees are unwarranted and unreasonable.

29.    To the extent the inspection fees charged by Defendants have arisen from purported efforts to conduct inspections of the interior of the Residence, Defendants have made no good-faith efforts to conduct any inspection of the interior and any fees arising from such purported efforts are unwarranted and unreasonable.

30.    To date, Plaintiff's account has been charged over $600 in such inspection fees.

## CLASS ALLEGATIONS

31.    Plaintiff brings this action on his own behalf and on behalf of all similarly situated individuals (the "Class," and each individual, a "Class Member") who, in the State of Illinois, were subject to the conduct described in this complaint during the "Class Period" of May 14, 2012 to the present.

32.    The Class includes hundreds, if not thousands, of individuals who are identifiable through Defendants' records, and individual joinder of all members of the Class is impracticable.

33.    Common questions of fact and law exist as to all Class Members and predominate over questions affecting only individual Class Members. Common questions for the Class include:

a.    Did Defendants' conduct constitute breach of contract?

b.    Did Defendants' conduct constitute a violation of their fiduciary duties?

c.    Did Defendants violate the Illinois Consumer Fraud and Deceptive Trade Practices Act?

d.    Is the Class entitled to actual and compensatory damages?

9

e.    Is the Class entitled to injunctive relief?

f.    Is the Class entitled to an award of punitive damages?

34.    Plaintiff will fairly and adequately protect the interests of the Class.

35.    Plaintiff's claims are typical of the claims of other Class Members.

36.    Plaintiff will fairly and adequately protect the interests of the Class. He is familiar with the facts that form the bases of the proposed Class Members' claims. Plaintiff's interests do not conflict with the interests of the other Class Members he seeks to represent. He has retained counsel competent and experienced in class action litigation and intends to prosecute this action vigorously. Plaintiff's counsel has successfully prosecuted complex actions including consumer protection class actions. Plaintiff and his counsel will fairly and adequately protect the interests of the Class Members.

37.    The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the proposed Class Members. The relief sought per individual member of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation of Defendants' conduct. Furthermore, it would be virtually impossible for Class Members to seek redress on an individual basis. Even if the Class Members could afford respective, individual litigations, such litigations would unduly burden the court system.

38.    Further, individual litigation of the legal and factual issues raised by the Defendants' conduct would result in delay in resolution and unnecessary expense for all parties and for the court system. The class action device presents far fewer management difficulties and provides the benefit of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

39.     In addition, a class action is superior to other available methods for fairly and efficiently adjudicating this controversy for reasons that include the following:

a.     the numerosity of the Class makes joinder impracticable;

b.     prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and which would establish incompatible standards of conduct for Defendants;

c.     prosecution of separate actions by certain individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede other Class Members' ability to protect their interests; and

d.     Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## DAMAGES

40.     Defendants' actions damaged Plaintiff and Class Members in that, among other things, they incurred charges they should not have been charged, increasing their debt or resulting in their making payments they should not have had to make.

41.     The amount of total damages sought is less than $5,000,000 collectively and inclusive of the requested compensatory and injunctive relief and Plaintiff's request for attorneys' fees. Further, no Class Member individually seeks more than $75,000.

## COUNT I
## (BREACH OF CONTRACT)

42.     Plaintiff incorporates the allegations of the foregoing paragraphs as if fully set forth in this claim.

11

43. Plaintiff's and Class Members' respective mortgage agreements are valid contracts.

44. The reasonable-inspection term in such agreements was a material contract term.

45. Defendants materially breached the terms of their respective mortgage agreements with Plaintiff and Class Members by charging fees for inspections that were not performed; were performed on pretextual bases rather than reasonable ones; or were performed in a manner not reasonably authorized under the reasonable-inspection term of Plaintiff's and Class Members' mortgage agreements.

46. As a result of Defendants' breaches of contract of their respective mortgage agreements with Plaintiff and Class Members, Plaintiff and the Class Members have suffered damages in the form of being charged and having paid unreasonable inspection fees.

47. Plaintiff, on behalf of himself and the Class, seeks actual and compensatory damages for Defendants' breaches of contract, plus interest, attorneys' fees, and costs.

## COUNT II
## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

48. Plaintiff incorporates the allegations of the foregoing paragraphs as if fully set forth in this claim.

49. A covenant of good faith and fair dealing was implied in the terms of Plaintiff's and Class Members' mortgage agreements with Defendants.

50. This implied covenant in these agreements prohibits Defendants from engaging in conduct and exercising discretion in a manner that frustrates Plaintiff's and Class Members' rights to the benefits of the contracts or that injure their rights to receive the benefits of their contracts.

51.     Defendants breached the implied covenant of good faith and fair dealing by failing to exercise their discretion in good faith, in that Defendants have purposefully conducted purported inspections and charged inspection fees, doing so as a pretext for generating monthly, recurring revenue and/or receivables, and Defendants have provided no reasonable and meaningful avenue for Plaintiffs and Class Members to avoid the inspection fees.

52.     Plaintiff, on behalf of himself and the Class, seek damages for Defendants' breach of the implied covenant of good faith and fair dealing, interest, attorneys' fees, and costs in an amount to be determined at trial.

### COUNT III
### (UNJUST ENRICHMENT)

53.     Plaintiff incorporates the allegations of the foregoing paragraphs as if fully set forth in this claim.

54.     In the event this Court finds that no contract provision expressly governs the claims arising from the allegations of this complaint, Plaintiff asserts that Defendants have knowingly received and retained benefits from Plaintiff and Class Members under circumstances that render Defendants' retention of such benefits unjust.

55.     Defendants knowingly received and benefitted from the financial gain in charging fees based on Defendants' intentional, unreasonable, pretext-based inspections and claimed inspections.

56.     Plaintiff's and Class Members' account liabilities for such fees and payment of such inspection fees have conferred a benefit on Defendants.

57.     Defendants' assertion of the right to be paid such fees and its retention of such fee payments is unjust.

58.     As an actual and proximate result of its actions, Defendants have received and retained benefits at the expense of and detriment to Plaintiff and the Class Members in the form of such inspection fee charges and payments.

59.     Plaintiff seeks removal of all charges and disgorgement and restitution of all revenue and profits gained through Defendants' unjust enrichment at Plaintiff's and Class Members' expense, plus interest and attorneys' fees, and costs, in an amount to be determined at trial.

## COUNT IV
## (VIOLATION OF THE CONSUMER FRAUD ACT)

60.     Plaintiff incorporates the allegations of the foregoing paragraphs as if fully set forth in this claim.

61.     The Consumer Fraud Act prohibits unfair or deceptive acts or practices, including the "misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2. Further, the Consumer Fraud Act states that such acts or practices are unlawful, "whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

62.     As alleged in this complaint, Defendants have charged recurring monthly property inspection fees for purported property inspections when, in fact, inspections were not performed; were performed on unreasonable and pretextual bases; or were performed in a manner not reasonably authorized under the reasonable-inspection term of Plaintiff's and Class Members' mortgage agreements.

63.     Defendants' failure to disclose its purposeful practice of engaging in unreasonable, pretext-based and purported inspections, and Defendant's unreasonably charging unavoidable inspection fees constituted a deceptive act in that it was a failure to disclose a material fact.

64.     Defendants concealed, suppressed, and omitted disclosure of their unreasonable inspection practices and imposition of inspection fees so that Plaintiff and Class Members would rely on the contractual term giving Defendants a right of reasonable inspection.

65.     Defendants' concealment, suppression, and omission of the disclosure of their inspection practices and fees would be misleading, and materially so, to a reasonable person.

66.     Defendants' concealment, suppression, and omission of the disclosure of their inspection and inspection fee practices, and the practices themselves, arose in the course of trade and commerce in Defendants' servicing of Plaintiff's and Class Members' mortgage agreements.

67.     Further, Defendants' unreasonable, monthly, ongoing, charging of inspection fees for nonexistent, unreasonably pretext-based, and contractually unwarranted forms of inspection constituted unfair practices.

68.     Defendants practices were unfair to Plaintiff and Class Members because: Defendants continued to conduct purported inspections and charge fees for them; Defendants communicated no reasonable basis for inspections; Defendants purported to seek interviews and engage in communications that they did not seek; Defendants conducted purported inspections when, in fact, inspections consisted largely of "drive-by" viewing or photographing of undivided common areas; Defendants identified no property conditions requiring remediation; and Defendants provided no means of avoiding such fees.

69.     Based on the conduct described herein and in the foregoing paragraph, Defendants' conduct was oppressive in that it unreasonably imposed fees on Plaintiff and Class Members and provided them no meaningful choice for avoiding such fees.

70. Defendants' conduct was immoral, unethical, and unscrupulous in that Defendants engaged in purported and pretextual inspections to charge unavoidable inspection fees for Defendants' own financial benefit.

71. As a result of Defendants' unreasonable, ongoing, unavoidable, and pretext-based inspection and inspection-fee-related practices, Plaintiff and Class Members were damaged.

72. Defendants unreasonable, ongoing, unavoidable, and pretext-based inspection and inspection-fee-related practices were the direct and proximate cause of Plaintiff's and Class Member's damages, in that Defendants engaged in such conduct or caused such conduct to be engaged in on their behalf, and did so with the intent and for the purpose of causing Plaintiff and Class Members to incur substantial damages in the form of charges for the complained-of inspection fees.

73. Accordingly, Plaintiff, on behalf of himself and the Class, seeks actual and compensatory damages, attorneys' fees, and costs as set forth in the Consumer Fraud Act, 815 ILCS 505/10(a), in an amount to be determined at trial.

74. Further, Defendants' unfair and deceptive acts, occurring in commerce, have continued and will continue to cause serious injury to Plaintiff and Class Members. Plaintiff therefore seeks an order seek an order requiring Defendants to remove all wrongfully imposed inspection fees from the accounts of Plaintiff and Class Members and enjoining Defendants from further violations of the Illinois Consumer Fraud Act such as are alleged in this complaint.

75. Further, Defendants' misconduct alleged herein constituted willful violations of the Illinois Consumer Fraud Act through intentional acts of unfairness, deception, and indifference to the rights of members of the public who had no means of avoiding Defendants' continued imposition of fees. Therefore, Plaintiff, on behalf of himself and the Class, seeks punitive

damages pursuant to the Consumer Fraud Act, 815 ILCS 505/10(a), in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for the following relief:

    a.    an order certifying the Class, as defined above;

    b.    an order appointing Scott A. Kamber and David A. Stampley of KamberLaw, LLC as Class Counsel and Ryan D. Andrews and David J. Dale of Edelson LLC as Liaison Class Counsel;

    c.    an award of the aggregated actual damages of the Class Members who have paid wrongful inspection fees;

    d.    an injunction requiring Defendants to remove outstanding charges for wrongful inspection fees from the accounts of Class members;

    e.    an injunction requiring Defendants to cease and desist from engaging in the conduct complained of herein;

    f.    an award of penalties and punitive damages;

    g.    an award of reasonable Attorney's fees and costs; and

    h.    a grant of such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: November 19, 2013

Respectfully submitted,

**STEVE S. WEINSHEL**, on behalf of himself and all others similarly situated,

One of Plaintiff's Attorneys

Ryan D. Andrews (randrews@edelson.com)
David J. Dale (ddale@edelson.com)

Edelson LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
Firm ID: 44146

Scott A. Kamber (*Pro hac vice* to be filed)
skamber@kamberlaw.com
David A. Stampley (*Pro hac vice* to be filed)
dstampley@kamberlaw.com
KamberLaw, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Tel: (212) 920-3072
Fax: (212) 202-6364

*Counsel for Plaintiff and the Putative Class*

# Exhibit A

# NOTE

**December 23, 2004**      **CHICAGO**                              **ILLINOIS**
[Date]                                    [City]                                    [State]

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, **CHICAGO, ILLINOIS 606**▓▓

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ ▓▓▓▓▓.00      (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
**NEW CENTURY MORTGAGE CORPORATION**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    **7.0500**    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    **1st**    day of each month beginning on    **February 1, 2005**.
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 1, 2035**       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   **18400 VON KARMAN, SUITE 1000**
**IRVINE, CA 92612**                              or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ ▓▓▓▓▓.▓▓

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

I may make a Full or Partial Prepayment without paying any penalty. If I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other Partial Prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a Full Prepayment at any time.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

ILLINOIS FIXED RATE NOTE - Single Family - Nonconforming                              **0002001216**

Page 1 of 3                                                                                              5/00



## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.00 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. APPLICABLE LAW

This Note shall be governed by the laws of the State of Illinois. If a law, which applies to this loan and sets maximum loan charges is finally interpreted so that the interest and other charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such interest or other charge shall be reduced by the amount necessary to reduce the interest or other charge to the permitted limit; and (b) any sums already collected from me which exceed permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment, but in no event will a prepayment charge be assessed if the Note Holder chooses to reduce my Principal balance by applying such excess amounts.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

0002001216

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
STEVEN S. WEINSHEL                         -Borrower

_____ (Seal)
MARY R. WEINSHEL                           -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

*[Sign Original Only]*

0002001216

## ESCROW ACCOUNT OPTION NOTICE

| Borrower Name (s):<br>STEVEN S. WEINSHEL<br>MARY R. WEINSHEL | Lender:<br>NEW CENTURY MORTGAGE CORPORATION<br>1375 WOODFIELD ROAD, SUITE 550<br>SCHAUMBURG, IL 60173 |
|---|---|
| Property Address:<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br>CHICAGO, IL 606▓▓ | Date:<br>December 23, 2004 |

This Notice is provided in accordance with Illinois Statutes.

☐ I (We) understand that a non-interest bearing escrow account is required for the payment of real estate taxes, hazard insurance, mortgage insurance, and flood insurance (if applicable) in connection with the loan being obtained on the property described above.

☒ I (We) understand that an escrow account is not required for the payment of real estate taxes, hazard insurance, and flood insurance (if applicable) in connection with the loan being obtained on the property described above. I (We) acknowledge my (our) legal responsibility for the payment of taxes and insurance. Illinois law allows me (us) to choose one of the following options.

    ☐ I (We) elect to manage the payment of insurance premiums, taxes and other charges for my (our) own account. I (We) acknowledge that the lender may require the establishment of a non-interest bearing escrow account for the payment of taxes and insurance if I (we) fail to pay the taxes, insurance premiums or other charges pertaining to the property securing the loan prior to the delinquency date for such payments.

    ☐ I (We) elect to open a passbook savings account at the depository institution and deposit into the account the funds which I (we) would have paid into an escrow account. The lender will not provide any escrow services for the payment of taxes and insurance premiums in connection with this account. The current passbook rate of interest is

    ☐ I (We) elect to maintain a non-interest bearing escrow account for the payment of ☐ real estate taxes, ☐ hazard insurance, ☐ flood insurance to be serviced by the lender at no charge to me (us). I (We) understand that the costs of real estate taxes, hazard insurance, and flood insurance ( if applicable) may increase in the future and that our monthly payment will be adjusted to reflect those increases.

    I (We) understand that I (we) may select a different option at any time. Any request to change the escrow account status of my (our) loan must be made in writing.

The undersigned hereby acknowledges receipt of a copy of this Notice.

| Borrower<br>STEVEN S. WEINSHEL | Date | Borrower<br>MARY R. WEINSHEL | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

NCMC RE-167 (IL)                                              re-167.ild jp 05/10/02

Return To:
NEW CENTURY MORTGAGE CORPORATION

18400 VON KARMAN, SUITE 1000
IRVINE, CA 92612

Prepared By:

NEW CENTURY MORTGAGE CORPORATION

————————————— [Space Above This Line For Recording Data] —————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **December 23, 2004** together with all Riders to this document.
(B) "Borrower" is
**STEVEN S. WEINSHEL    AND MARY R. WEINSHEL   , HIS WIFE  ,  AS JOINT TENANTS**

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is **NEW CENTURY MORTGAGE CORPORATION**

Lender is a **CORPORATION**
organized and existing under the laws of **CALIFORNIA**

**0002001216**

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014 1/01

-6(IL) (0010)

Page 1 of 15          Initials: _____

VMP MORTGAGE FORMS - (800)521-7291



Lender's address is 18400 VON KARMAN, SUITE 1000
IRVINE, CA 92612

Lender is the mortgagee under this Security Instrument.

**(D)** "Note" means the promissory note signed by Borrower and dated **December 23, 2004**
The Note states that Borrower owes Lender ████████████████████████████████████████
██████ and No/100 ------------------------------------------------------- Dollars
(U.S. $ ████████.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **January 1, 2035**

**(E)** "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

**(F)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(G)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(I)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(J)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** "Escrow Items" means those items that are described in Section 3.

**(L)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.

**(M)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

**(N)** "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a
"federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan"
under RESPA.

0002001216

Initials: _____

-6(IL) (0010)          Page 2 of 16          Form 3014  1/01

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the **COUNTY** [Type of Recording Jurisdiction] of **COOK** [Name of Recording Jurisdiction]:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

Parcel ID Number: ░░░░░░░░░░░░░░░      which currently has the address of
░░░░░░░░░░░░░░░░░░░░░░░░░░      [Street]
**CHICAGO**      [City], Illinois **606**░░ [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

0002001216

Initials: _____

-6(IL) (0010)      Page 3 of 16      Form 3014 1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity: or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note: (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property: (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the

excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

0002001216

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

0002001216

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments form third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall

not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0002001216

Initials: _____

 -6(IL) (0010)          Page 12 of 15          Form 3014  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

0002001216

 -6(IL) (0010)          Page 13 of 15          Initials: _____          Form 3014  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
STEVEN S. WEINSHEL                    -Borrower

_____

_____ (Seal)
MARY R. WEINSHEL                      -Borrower

_____ (Seal)          _____ (Seal)
                -Borrower                                 -Borrower

_____ (Seal)          _____ (Seal)
                -Borrower                                 -Borrower

_____ (Seal)          _____ (Seal)
                -Borrower                                 -Borrower

STATE OF ILLINOIS,                                              County ss:
    I,                                        , a Notary Public in and for said county and
state do hereby certify that

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.
    Given under my hand and official seal, this                      day of

My Commission Expires:

_____
Notary Public

**0002001216**

Initials:_____

-6(IL) (0010)                          Page 16 of 16                    Form 3014  1/01

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 23rd day of December 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
NEW CENTURY MORTGAGE CORPORATION

(the

"Lender") of the same date and covering the Property described in the Security Instrument and located at:
███████████████████████, CHICAGO, ILLINOIS 606██

[Property Address]
The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:
███████████████████

[Name of Condominium Project]
(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the

0002001216

MULTISTATE CONDOMINIUM RIDER-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

███-8R (0401)    Form 3140 1/01
Page 1 of 3        Initials:_____
VMP Mortgage Solutions
(800)521-7291

provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

0002001216

Initials:_____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)          _____ (Seal)
STEVEN S. WEINSHEL          -Borrower    MARY R. WEINSHEL          -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                              -Borrower

0002001216

⊚-8R (0401)                    Page 3 of 3                    Form 3140 1/01